The TRAVELERS INSURANCE COMPANY, Appellant,

v.

Bladon WILLIAMS, Appellee.

No. 5031.

Court of Civil Appeals of Texas.

Beaumont.

Jan. 20, 1955.

Charles S. Pipkin, Beaumont, for appellant.

Mike Daughtry, Beaumont, for appellee.

R. L. MURRAY, Chief Justice.

This is an appeal by The Travelers Insurance Company, appellant, from a judgment against it in favor of Bladon Williams, appellee, in a workmen's compensation case in the County Court of Jefferson County, at Law.

The appellee was awarded compensation benefits at the rate of $25 per week for 26 weeks because of a hernia. The judgment was based on the verdict of the jury.

The appellant says that the judgment was erroneous because the appellee failed to sustain the burden of proof upon him to show by a preponderance of the evidence that his hernia did not exist in any degree prior to his injury in the course of his employment. The jury found in its verdict, in answer to Special Issue No. 8 of the court's charge, that the hernia did not exist in any degree prior to the injury and the appellant's contention on appeal is that such finding by the jury was against the great weight and preponderance of the evidence, and that the great weight and preponderance of the evidence showed that the hernia did exist in some degree prior to the injury.

The appellant relies largely in this contention on the testimony of Dr. Byrd, who performed an operation for a right inguinal hernia upon the appellee two days after he received the accidental injury, according to the testimony. Dr. Byrd's testimony is as follows:

"Q. You operated this man, did you? A. I did.

"Q. Was there any—Did you notice whether—Had he ever been operated on before? Was there any scar there? A. There was no scar, as of a surgical incision.

"Q. What do you mean? No scar showing there had been an opening there? A. No. No scar to indicate an opening, as would be made for an operation. No scar there, as would be made, as for an operation.

"Q. Did you or not notice anything peculiar about this particular area, while you were operating, or after opening up the wound? A. Yes, I did.

"Q. What was it? A. In dissecting the tissue, to expose the cord, in its canal, at the point—on reading the exterior ring, to section it, and open the canal, to bring the cord up, for handling it and working on it, there was an un-usual area of dense old scar tissue, attaching the edge of the exterior ring, to the tissue of the cord, and before the ring could be cut through, and dissected away, this scar tissue being old, and in that particular location, suggested, as I have noted here in my written record of this operation, that a sclerosing solution had been deposited there—a sclerosing solution is one that is designed to make scar tissue, and is the type solution that is injected by needle at this particular point, as one medium used by some doctors to treat a hernia, in an attempt to cure it, or to do away with it. Now, deposited in this particular location, a small area of dense old firm scar, in such a specific area, and not in adjacent areas, would suggest that some type of solution of that nature had been deposited at one special spot, which would be this spot, which would be, ordinarily, the site of injecting, in that type of treatment, the so-called injection type treatment for hernia. Now, in addition to that—shall I go on and describe the unusual conditions?"

He further testified with reference to what he found upon the radical operation, as follows: "* * * which indicates to a surgeon this sac had been in that position for a very long time—a time in which the tissue from the end of the sac on down the cord, would have become firm, dense, and tough, of a nature that would be termed scar tissue, and which process would take, certainly many months, and probably a year, or longer, for even any scar tissue to form * * *."

He further testified, as to the prior existence of the hernia, as follows:

"Q. These facts reflect—as a medical man, do they not indicate to you, this hernia you repaired there, when you got in there—is it or not your medical opinion this situation had been treated, that is, the hernia had been treated, prior, in some fashion, by cutting—by injection, some time prior to the time you operated, on the twenty-fifth of June? A. It is my medical opinion that the state of the scar tissue, described, attaching the edge of the interior ring to the cord, was such that the most probable, or likely explanation, from a medical standpoint, was that there had been an attempt made to cure this hernia by an injection type treatment, and that attempt had been made at least six months, or more, before the time I looked at it, at the time of the operation.

"Q. Well, would that indicate to your mind, as a physician—you have operated on many hernias, have you not? A. That's right.

"Q. Did that indicate to your mind that a hernia had existed in some degree, prior to the time you had seen him—the first date—if it was June twenty-fifth? A. June twenty-second, when he first came in. That was the day when he felt pain in his groin, and came over for an examination, at which time I found the hernia, and that indicates to me that the most probable explanation for that scar being there,

is that he had a hernia before I examined him on June twenty-second, and an attempt had been made to treat it by injection. In addition to the other reasons why I felt medically—my medical opinion is that the hernia existed before I saw him—before I examined him on June twenty-second, was that there had not been enough time between June twenty-second, the time he had told me he had hurt himself, and June twenty-fifth—three days to the time of operation—that there had not been enough time in those three days for the scar tissue to form * * *.

"Q. In other words, if I understand your medical terms—if I didn't, correct me—what you say is that, to some extent, it was what you call congenital—he was born with a certain amount of hernia, which may or may not have given him a lot of trouble. A. That's right.

"Q. But, in addition to that, there had been some treatment of it. A. There was indication that would suggest there had been some treatment, and that treatment had taken place at least six months prior to the operation.

"Q. You speak of a sclerosing solution being made. Is that put in by needle? A. An injection by needle, the needle having been passed through the scar, along the cord, to put the point of the needle at the exterior ring, whereby injecting the needle at that time and point, would create scar tissue, in an attempt to cure the hernia.

"Q. State whether or not that is a form of treatment—A. That is a form of treatment used by some doctors in an attempt to cure a hernia."

Further Dr. Byrd testified as follows:

"A. The question, as I understand it, was this. What was the size, in my opinion, of the hernia, at the time the injection treatment was given. If that's right, as is my opinion, from the scar tissue found—Am I correct on the question.

"Q. Yes, that's the sense of it. A. If there was injective treatment given, I testified a while ago, there would be evidence—there was some knowledge on the part—in my opinion, on the part of the patient and the doctor giving the treatment, there was hernia present. Therefore, my opinion is, the hernia was in such state that it was, at that time, found, at least by the doctor, so that he felt there was a hernia there, and he had given some injection treatment in an attempt to cure it, so that's the best I can answer that question, as I feel the hernia was in such condition at the time of such injection treatment,—at the time such treatment could be given, that it could be detected by the doctor who gave the injection treatment."

Williams, the appellee, testified, in part, as follows:

"Q. Did you ever have any bulge there on your stomach, or anywhere else, on your stomach, before? A. No, sir; never have been hurt in my life.

"Q. About where this protrusion—this hernia was, had you ever had an accident any time in your life—had a bulge there, or suffered pain at all? A. No, I never have.

"Q. You've been out there thirty-two years; have you ever been hurt before on the job; made any claim? A. No."

On cross-examination appellee testified:

"Q. Now, do you say you went there and—I want to get this right—that you never had had any treatment for anything, down in your right side. A. No.

"Q. That was your right side? A. Yes.

"Q. Never had had appendicitis—a hurting in your right side? A. No.

"Q. Never had an accident before, fell or jumped and strained yourself, and felt a pulling and soreness down there? A. Never had.

"Q. You never had? A. No.

"Q. And nobody had ever worked on you there, in that area, at all, for nothing? A. No, sir. Dr. Bird, he only called us up there to get examined, the time I injured my finger, I went down there.

"Q. I am talking about your right groin—right side, where you had the hernia. A. No, sir.

"Q. No doctor ever worked around there, or did any treatments? A. No.

"Q. Never stuck any needle in there, treated you or gave you an injection, is that right? A. Yes."

■ In Lewis v. American. Surety Company, 143 Tex. 286, 184 S.W.2d 137, it is held that a hernia is a protrusion of some organ or tissue from its normal situation through an accidental or natural opening in the wall of the cavity in which it is contained, and that the mere presence of a perforation or an aperture in the cavity wall, either accidental or natural, and through which some organ or tissue may protrude at a later time, is not a hernia within the meaning of the workmen's compensation statute; that if there was no protrusion in any degree, there was no hernia in any degree.

■ In applying the holding in that case to this appeal we conclude that the preponderance of the evidence did not show that Williams had had a prior hernia, and that the evidence is sufficient to support the jury's finding in answer to Special Issue No. 8 that a hernia did not exist in any degree prior to the injury. Dr. Byrd's testimony does not go so far as to state that, even in his opinion, there had ever been a protrusion in the old scar tissue which he found in performing the operation on Williams. The testimony of the appellee himself raised a fact issue as to whether he had ever had a hernia before his injury.

752

The court in its charge gave a definition of hernia in almost the exact language used in the opinion in Lewis v. American Surety Company, supra. The jury's answer to Special Issue No. 8, finding that the hernia did not exist in any degree before the injury, was a finding that there was no protrusion prior to the injury, and the evidence sustains such a finding.

On the authority of the Lewis v. American Surety Company case, supra, all of appellant's points are overruled and the judgment is affirmed.